UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE


Eugene I. Davis, as Trustee
Of the GTAT Litigation Trust, the
Duly authorized successor to GT
Advanced Technologies Inc., et al.

      v.                            Civil No. 17-cv-147-JL
                                        Opinion No. 2018 DNH 063

Thomas Gutierrez and
Daniel W. Squiller


**MEMORANDUM OPINION**

This case involves the actions (and lack thereof) of two former corporate officers of the New Hampshire-based GT Advanced Technologies, Inc. ("GTAT"), a now-bankrupt manufacturer of materials for consumer electronics. The plaintiff[1] alleges that the two former officers, Thomas Gutierrez and Daniel Squiller, misled GTAT's board of directors regarding the technological and economic feasibility of its venture with Apple, Inc., in which GTAT was to manufacture sapphire for potential use by Apple to make its smartphone touch-screens more impervious to ruinous damage.

Broadly speaking, the plaintiff asserts that the defendants knew or should have known that the agreement with Apple ("Apple

---

[1] The plaintiff is the Trustee of the GTAT Litigation Trust, the duly authorized successor-in-interest to GTAT and its affiliated debtors.

Agreement") was doomed to fail, misled and concealed their knowledge from GTAT's board of directors to get the board to approve the deal, and then reaped substantial profits before GTAT collapsed into bankruptcy less than one year after entering into the agreement. The plaintiff's complaint asserts four claims against both defendants: Breach of the Fiduciary Duty of Care (Count 1); Breach of the Fiduciary Duty of Loyalty (Count 2); Corporate Waste (Count 3); and Equitable Subordination (Count 5). It also asserts two claims against Gutierrez only: Breach of Contract (Count 4); and "Objection to Claims" (Count 6), as well as one claim against Squiller only: "Objection to Claims" (Count 7).

The defendants have moved to dismiss all claims in the complaint[2] other than the breach of contract claim asserted against Gutierrez in Count 4.[3] They contend that all of the

-------------------

[2] Doc. no. 1.

[3] The defendants purportedly moved to dismiss the plaintiff's complaint in its entirety, but make no argument in their motion papers as to Count 4, the breach of contract claim against Gutierrez. At oral argument, the defendants asserted that, despite not addressing Count 4 in their motion papers, they were seeking to dismiss the claim based on Rule 9(b). Although the court fails to see how Rule 9(b) would apply to a claim alleging that Gutierrez breached an agreement to repay a portion of the money GTAT advanced him to purchase a secondary residence, the defendants' failure to address that claim in their motion is a sufficient reason to deny the motion to the extent it seeks dismissal of Count 4. Coons v. Indus. Knife Co., Inc., 620 F.3d 38, 44 (1st Cir. 2010) (noting that the First Circuit has emphasized that "judges are not obligated to

claims are subject to the heightened pleading standard of Federal Rule of Civil Procedure 9(b) because they all "sound in fraud" and assert that the plaintiff has pled none of his claims with the requisite particularity. They further argue that even if Rule 9(b) does not apply, the plaintiff's claims should still be dismissed because they fail under the more lenient pleading standard of Federal Rule of Civil Procedure 8(a). The court held oral argument on March 20, 2018. After review of the defendants' motion, the plaintiff's objection, the defendants' reply, and the parties' exhibits, and after consideration of oral argument, the court denies the defendants' motion in its entirety.

## I.  **Background**

The court culls the following facts from the complaint, from information contained in documents on which the complaint relies and which are central to the plaintiff's claims, and from publically filed documents. See Curran v. Cousins, 509 F.3d 36, 44 (1st Cir. 2007) (in determining the sufficiency of the complaint under Rule 12(b)(6), the court may consider "documents central to plaintiffs' claim [and] . . . documents sufficiently referred to in the complaint." (internal quotation omitted)).

---

do a party's work for him, 'searching sua sponte for issues that may be lurking in the penumbra of the motion papers.'" (quoting United States v. Slade, 980 F.2d 27, 31 (1st Cir. 1992))).

A.  GTAT and sapphire

Prior to 2010, GTAT -- then known as GT Solar
International, Inc. -- manufactured furnaces and other equipment
used to make components for the solar power industry.  As that
industry weakened and GTAT's revenues declined, GTAT began
producing sapphire crystal growth equipment in mid-2010.
Sapphire, one of the hardest substances on Earth, is generally
scratch and chemical resistant, transparent and durable.  It is
typically used in light-emitting diodes (LEDs), light sources
for large outdoor displays, and general illumination for lamps,
architectural lighting, and retail displays.  Although it is
naturally occurring, sapphire can also be synthetically
manufactured in "advanced sapphire crystallization furnaces"
("ASC furnaces" or "furnaces"), which heat component compounds
to temperatures in excess of 3000 degrees Fahrenheit.

After acquiring other companies with experience in the
sapphire industry, GTAT began to design and produce ASC
furnaces, which it sold to third parties to produce sapphire.[4]
By the end of 2012, GTAT's sapphire business was primarily
related to manufacturing and selling furnaces, rather than

_____

[4] While producing ASC furnaces, GTAT continued its solar
power industry-related production.

4

production of sapphire, though GTAT continued to produce sapphire in limited quantities.  After an initial increase in revenue from its furnace production and sales, however, GTAT's revenues and income declined sharply in the fiscal years ending December 31, 2012 and at the start of 2013.  This income decline was reflected in falling stock prices.  GTAT's stock price fell from $16.51 per share in early July 2011 to $2.94 per share in early January 2013.  In light of GTAT's struggles, neither Gutierrez, GTAT's president and chief executive officer, nor Squiller, GTAT's chief operating officer, received a performance-based bonus at the end of 2012.

With GTAT's business struggling, Gutierrez and Squiller shifted the company's focus to another market: smartphones. Gutierrez and Squiller believed that sapphire's strength, transparency, and durability made it an ideal material to replace the glass screens used in most smartphones.  At that time, however, sapphire use had been limited to smaller phone components, such as camera lenses, because of the high cost of producing large enough amounts of sapphire of sufficient quality.  To produce synthetic sapphire of high quality, various compounds are heated to extreme temperatures in ASC furnaces, which, over a period of weeks, grow large crystal logs of sapphire called "boules".  These boules, if of sufficient

quality, are fabricated and separated into wafers for use in other products.

In order to lower costs and produce the most affordable high-quality sapphire material, manufacturers attempt to make the largest boules possible. By early-2013, the maximum boule size that any manufacturer (in this case, GTAT) had been able to produce was 115 kg. According to GTAT, it took roughly three years (from March 2010 to early 2013) to increase the maximum boule size from 85 kg to 115 kg. However, it was understood that much larger boules were necessary to justify cost-effective production of sapphire for smartphone display screen production.

B.   <u>Negotiations with Apple</u>

In early 2013, Gutierrez and Squiller learned that Apple was considering incorporating sapphire display screens into its new iPhone 6 that was to be unveiled in late-2014. Both men made a presentation at Apple's headquarters regarding GTAT's developments in sapphire production at that time.

Over the next several months, Gutierrez and Squiller had numerous meetings with Apple executives, during which they pitched GTAT as capable of partnering with Apple. In other words, although GTAT had primarily been a manufacturer and marketer of ASC furnaces rather than a producer of sapphire, Gutierrez and Squiller pitched GTAT as being able to produce and

supply Apple with a significant quantity of sapphire in any venture involving iPhone screens.

In late-May 2013, Gutierrez and Squiller proposed a plan to Apple in which GTAT would sell 875 furnaces to Apple, install them at an Apple-owned facility, and manage the entire sapphire production process at the facility. They proposed an aggressive sapphire production schedule, including producing 145 kg boules by late-2013 and 165 kg boules by early-2014.[4]

A few weeks later, Apple informed GTAT that the new iPhone 6 would have a larger display screen than originally anticipated. Members of the GTAT team who were working with Gutierrez and Squiller on the proposed Apple venture informed them that the change would require a significant increase in either the size of the sapphire boules GTAT would need to produce or the number of furnaces that Apple would need to purchase. Either change would involve a large increase in the cost to Apple. Gutierrez and Squiller instructed the GTAT team to figure out a way to limit the cost increase of the deal to Apple to no more than 20% in order to keep the deal enticing to Apple and best any deal that might be proposed by a competitor.

---

[4] At that point, GTAT had not yet produced a sapphire boule larger than 115 kg.

On June 19, 2013, Gutierrez and Squiller met with Apple
executives again.  In light of the larger screen size on the
iPhone 6, they proposed increasing both the number of furnaces
GTAT would supply to Apple (from 875 to 910)[5] and the size of the
sapphire boules GTAT would produce.  Specifically, Gutierrez and
Squiller proposed producing 165 kg boules in January 2014 and
260 kg boules in June 2014.  When Apple expressed doubts about
GTAT's ability to produce 260 kg boules, particularly those that
would yield enough usable sapphire, Gutierrez agreed to "link
approximately $200M of the [ASC furnace] purchase price to this
milestone putting our money where our mouth is."[6]

C.   GTAT's internal team expresses reservations

Throughout the summer of 2013, various members of the GTAT
team that were involved with the Apple venture expressed to
Gutierrez and Squiller their reservations about the parameters
of the proposed deal.  For example, Dr. Christine Richardson,
the head of research and development for GTAT, told Squiller
that GTAT's chances of successfully growing 260 kg boules by
June 2014 was just a four on a scale of one to ten.

---

[5] Gutierrez originally proposed to Apple that GTAT would
supply 1,200 furnaces.  Three days later, Gutierrez modified his
proposal to supply 910 furnaces.

[6] Complaint (doc. no. 1) at ¶ 45.

In late June 2013, James Zahler, another member of GTAT's research and development team, expressed reservations to both defendants about needing to produce a 260 kg boule within one year. Zahler noted that a 225 kg boule was already "uncharted territory" and that a 260 kg boule would increase the "technical risk" beyond what he was comfortable with.[7]

On June 26, 2013, Gene Skayne, GTAT's Vice President of Finance, emailed Squiller and Paul Matthews, a GTAT product manager, questioning GTAT's cost models regarding the feasibility of the company producing massive quantities of sapphire on an expedited schedule in a cost-effective manner. Skayne expressed concern over the aggressive utilization rates[8]

---

[7] The defendants included with their reply brief a copy of Zahler's June 2013 email expressing his concerns, see doc. no. 29-3, as well as three other emails containing statements by GTAT employees that the plaintiff alleges shows the infeasibility of the Apple venture. The defendants also include with their reply a document summarizing those emails, see doc. no. 29-1, which they contend shows that the plaintiff "has distorted the documents on which he relies." Id. at 1. Even if the court could properly consider that document at this stage of the litigation, the defendants overstate the inferences that can be drawn from the communications in their entirety. Regardless, at this stage of the litigation, the court must draw all reasonable inferences in favor of the plaintiff, not the defendants. See Katz v. Pershing, LLC, 672 F.3d 64, 70 (1st Cir. 2012). As explained more fully infra, the defendants' repeated attempts to have the court draw inferences in their favor is misplaced.

[8] A utilization rate is the percentage of days out of the year that the furnaces would need to be operating, as opposed to being out of service for maintenance work and other issues.

used in GTAT's models, which had started at 90% but which Gutierrez and Squiller had pushed to 98%. Skayne noted that the change "is very aggressive and I don't see how we get there."[9] Zahler similarly noted at one point that the 98% utilization rate was just "wishful thinking."[10]

Skayne's June 26 email also questioned the models' use of a 4% failed run rate.[11] Skayne noted that GTAT's experience in one of its plants was a failed run rate of about 10% — 12% even for much smaller boules, and that previous models for the Apple project had used an 8% rate. Skayne asked "what has changed?"[12]

The following day, Skayne emailed Squiller again questioning the updated models for the Apple project:

> I had a call today with [GTAT's internal] team where we discussed changes made to the assumptions I referenced below . . . changing failed runs from 8% to 4%, going from 165 kg boule to 240 kg boule, etc. It seems like the driving force behind these changes is [Gutierrez's] aversion to showing the need for more than 1000 furnaces for the 70K screen project. While I understand the need to take an aggressive position to make sure we get this business, we need to be aware of the risks we are taking and work over the coming months to mitigate those risks. . . . I don't want us all to look stupid next year if we can't get anywhere near the targets agreed with the customer. We've set

---

[9] Complaint (doc. no. 1) at ¶ 63.

[10] Id.

[11] A failed run rate is the percentage of attempts to grow a single sapphire boule per year that are unsuccessful.

[12] Complaint (doc. no. 1) at ¶ 65 (alteration omitted).

a very high bar for ourselves here and need to make
sure we deliver.[13]

Squiller responded that both he and Gutierrez were aware of the
increased risks, and noted that "Apple has a box we are trying
to get into to make the program viable."[14]

D.   Apple changes the terms of the deal

     In late-August or early-September 2013, Apple suddenly
changed course and proposed entirely different terms to
Gutierrez and Squiller.  Under Apple's revised proposal, rather
than Apple purchasing fewer than 1,000 ASC furnaces from GTAT
and having GTAT manage the production of sapphire, GTAT would:
(a) itself purchase more than 2,000 furnaces to manufacture
250,000 iPhone screens per day using "prepayments" from Apple
(at that time, GTAT had sold and installed fewer than 600
furnaces in its entire history);[15] (b) install those furnaces in
a large, yet-to-be constructed facility located in Mesa,

_____

     [13] Id. at ¶ 66.

     [14] Id. at ¶ 67.

     [15] The number of iPhone screens to be produced under
Gutierrez's previous proposal is unclear, but it appears to be
fewer than 120,000 screens per day.  See Complaint (doc. no. 1)
at ¶ 44 (alleging that Gutierrez proposed on June 19, 2013 that
GTAT sell to Apple 1,200 furnaces to manufacture 120,000 screens
per day, and then subsequently submitted a revised proposal
which reduced the number of furnaces to 910).

Arizona, which GTAT would lease from Apple, and (c) produce sapphire boules "on an expedited basis, in staggering volumes, and of unprecedented size and quality."[16]  Specifically, with regard to the production of sapphire boules, rather than the already optimistic goal of producing a 260 kg boule by June 2014, Apple proposed that GTAT produce (a) a 262 kg boule by January 6, 2014, (b) 21 such boules by February 1, 2014, (c) 806 such boules by March 31, 2014, and (d) 5,301 such boules by June 30, 2014.  GTAT's failure to adhere to the aggressive schedule would force it to pay significant liquidated damages penalties.

In addition to these terms, GTAT would need to bear the cost of more than 700 personnel, utilities, insurance, and raw materials for the Arizona facility.  GTAT would also be required to grant Apple a security interest in the furnaces.  Finally, Apple was under no obligation to purchase any sapphire from GTAT, even though GTAT was not allowed to sell its sapphire to any other entity.  In other words, under Apple's proposal, GTAT would only realize a profit if (a) the company was able to produce massive amounts of sapphire that Apple valued in excess of the prepayments it had transferred to GTAT and (b) Apple agreed to purchase the sapphire in an amount exceeding the pre-payments.  Squiller would later describe Apple's sudden revision

---

[16] Complaint (doc. no. 1) at ¶ 47.

of the terms of the proposed venture "after months of extensive negotiations over price and related terms" as "a classic bait and switch."[17]

E.    GTAT's internal team raises concerns about revised terms

GTAT's internal team's skepticism about the terms of the proposed Apple venture grew stronger after Apple provided the new parameters of the deal.  In mid-September 2013, Zahler informed Squiller that GTAT's efforts to produce quality sapphire boules larger than 115 kg were not going well, as larger boules had lower or only "sporadic" quality performance.[18] Richardson felt the "timeline was crazy" while Zahler described it as "just bonkers."[19]  As for Matthews, he felt that the new terms represented a "paradigm shift,"[20] and that Gutierrez's and Squiller's push to make the deal work caused GTAT's internal models to "drift[] further and further away from what [GTAT] had data to support was doable."[21]

---

[17] Squiller Decl. (doc. no. 26-2) at p. 5, ¶¶ 10, 11.

[18] Complaint (doc. no. 1) at ¶ 59 (alteration omitted).

[19] Id. at ¶ 60.

[20] Id.

[21] Id. at ¶ 62.

Matthews expressed concern to Squiller over the increasing yield rate included with GTAT's revised cost models, which had increased from 44% in June 2013 to 57% in August.[22] Matthews was particularly troubled because Apple had not yet given GTAT the final specifications for the screens to be manufactured and, therefore, Matthews felt like the projection, which seemed much too aggressive in any case, was largely guesswork. Eventually, when GTAT received the final specifications from Apple, Matthews raised further concerns with Squiller, as those specifications should have reduced the expected yield rate, but instead the cost models used by Gutierrez and Squiller showed an increased yield rate. Squiller responded that the team felt like Matthews "was resisting the change" and he urged Matthews to "play along with the requests that were being made."[23] According to Matthews, however, neither he nor the other members of the GTAT team believed the projected yield numbers could possibly be attained.

In September 2013, Richard Gaynor, GTAT's chief financial officer, also expressed concern about the 57% yield rate being used in the models when GTAT's historic yield rate ranged from

---

[22] The yield rate is the percentage of sapphire per boule that is of sufficient quality to be used to create iPhone screens.

[23] Complaint (doc. no. 1) at ¶ 70.

30% to 40%.  When Gaynor asked Skayne if GTAT's goals under the
Apple Agreement were "supported by actual experiences," Skayne
replied that the yield numbers simply kept rising and that
Squiller had agreed with Apple that it could be done.[24]

Gutierrez and/or Squiller made additional changes to the
underlying assumptions in GTAT's cost models to make Apple's
revised proposed terms seem workable from GTAT's perspective.
For example, GTAT's early models used an "excess capacity"
multiplier between 5% — 15%.[25]  GTAT's final model used just a 3%
excess capacity multiplier.  Similarly, Gutierrez and Squiller
simply adopted Apple's proposed fabrication costs and
assumptions[26] into GTAT's models, despite being informed by
GTAT's team "that Apple's information was unrealistic."[27]  When
the GTAT team expressed these concerns to Squiller, he ignored
them and simply directed them to use Apple's information.

---

[24] Id. at ¶ 71.

[25] An excess capacity multiplier is a percentage used to
calculate how many additional furnaces need to be produced
beyond the minimum number expected for the project (i.e., if
GTAT expected to need 100 furnaces under the terms of a deal,
and it used a 15% excess capacity multiplier, GTAT would account
for the cost of 115 furnaces in its models).  It is considered a
"safety margin" to guard against failure of furnaces.  Complaint
(doc. no. 1) at ¶ 68.

[26] The fabrication costs relate to the process associated
with cutting, polishing, and shaping the sapphire boules.

[27] Complaint (doc. no. 1) at ¶ 73.

F.  GTAT board considers and ultimately approves the Apple
    Agreement

In September 2013, Gutierrez conceded privately that GTAT
had "gotten sucked in" and that the Apple deal "sucks."[28]
Nevertheless, because he and Squiller had failed to explore
other potential business partners throughout 2013, Gutierrez
acknowledged that not entering the agreement with Apple meant "a
lot of cost reduction" for GTAT, including cuts to his and
Squiller's salaries.[29]  Around the same time, Squiller similarly
acknowledged that GTAT's "economics were already on the edge"
and "failure likely means bankruptcy of the company."[30]

Nevertheless, Gutierrez and Squiller continued to recommend
the Apple deal to GTAT's board of directors.  In September,
Gutierrez represented to the board that GTAT had been "treated
as a valued partner" throughout the negotiation process with
Apple.[31]  On October 22, 2013, Gutierrez described GTAT as having
made "very significant progress" with negotiations and stated
that the company had secured several key concessions from Apple,

---

[28] Id. at ¶ 50.

[29] Id.

[30] Id. at ¶ 75 (alteration omitted).

[31] Id. at ¶ 76.

including contract provisions regarding "warranties, liquidated damages, treatment of intellectual property and to a more limited extent the economics of the deal for GTAT."[32]  In addition, Gutierrez assured the board that GTAT's internal cost models which showed that the production schedule was feasible were based on "conservative" assumptions.[33]

The plaintiff alleges that in reality, however, little if any of this was true.  As Squiller later described, after Apple had proposed revised terms in late-August or early-September 2013, "[w]hat ensued was anything but an arm's-length negotiation.  Apple simply dictated the terms and conditions of the deal to GTAT."[34]  And, as discussed supra, the plaintiff alleges that the assumptions underlying the models were far from conservative, and in fact were so aggressive that they were unattainable.

On October 28, 2013, Gutierrez recommended to GTAT's board of directors that they approve the Apple Agreement, stating that management "had deemed the transaction to be in the best

---

[32] Id. (alteration omitted).

[33] Id. at ¶ 77.

[34] Squiller Decl. (doc. no. 26-2) at 8, ¶ 16.

interest of the Company."[35]  That same day, the board of directors voted to approve the Agreement.

The Apple Agreement approved by the board contained terms similar, if not identical, to those Apple proposed in late-August or early-September 2013.  Specifically, the Agreement called for Apple and GTAT to jointly develop a facility in Mesa, Arizona, where GTAT, employing over 700 people and using more than 2000 ASC furnaces, would manufacture sapphire exclusively for Apple.  Rather than its past practice of selling the furnaces, GTAT would own and operate them.  In addition, Apple was to provide GTAT with a "prepayment" of approximately $578 million to be paid in installments, which GTAT was to repay over five years, starting in 2015.

G.    Defendants profit from the Apple Agreement

Not surprisingly, shortly after the Apple Agreement was announced, GTAT's stock price skyrocketed.  In response, on December 16, 2013, Gutierrez entered into a Rule 10b5-1 plan.[36] Between December 16, 2013 and March 13, 2014, Gutierrez sold

---

[35] Complaint (doc. no. 1) at ¶ 51.

[36] A Rule 10b5-1 plan is an agreement "which allows corporate insiders to set a schedule by which to sell shares." Wietschner v. Monterey Pasta Co., 294 F. Supp. 2d 1102, 1117 (N.D. Cal. 2003).

343,625 shares of GTAT's stock under the plan.  Gutierrez also sold an additional 90,000 shares on the open market outside of the plan, and he exercised his option on another 100,000 shares.

On March 14, 2014, Gutierrez entered into another Rule 10b5-1 plan.  Pursuant to this second plan, Gutierrez sold an additional 264,248 shares of GTAT stock and exercised his option on 100,000 more shares.  In total, Gutierrez sold nearly 50% of his holdings in GTAT stock after the Apple deal for about $10.5 million.  Squiller, meanwhile, sold approximately 12% of his holdings in GTAT stock (121,190 shares) after the Apple Agreement for about $2 million.[37]

In addition, both Gutierrez and Squiller received large cash bonuses after GTAT entered into the Apple Agreement.  In late-2013, Gutierrez received a $1.25 million bonus and Squiller received a $772,500 bonus.

I.  GTAT immediately fails to perform under the Apple Agreement

GTAT quickly fell behind its targets under the Apple Agreement.  Early attempts to successfully produce a 262 kg sapphire boule failed.  In November 2013, four of the five 262 kg boules GTAT produced were unusable, and the fifth yielded just 43 mm of usable sapphire, well below the necessary yield

_____

[37] Neither Gutierrez nor Squiller had sold any shares of GTAT stock in nearly a year prior to these sales.

rate.  By December 2013, GTAT was already four weeks behind schedule, and attempts to create usable 262 kg sapphire boules continued to fail.

By June 2014, after repeated delays and failures to adhere to the production schedule in the Apple Agreement, Gutierrez met with Apple to "fall on his sword," and noted several problems with GTAT's attempts to meet the parameters of the deal, nearly all of which were identified by the GTAT team before entering into the Apple Agreement.[38]  Shortly thereafter, GTAT abandoned its attempts to produce a 262 kg sapphire boule, and instead tried to comply with the other terms of the Apple Agreement by producing smaller boules.

In addition, the Arizona facility encountered significant delays and additional costs.  The facility required 350 more employees than what was originally estimated, and it was considered a "highly contaminated environment" because of the ongoing construction work.[39]

In August or September 2014, GTAT attempted to renegotiate the Apple Agreement.  Apple expressed a willingness to make some of GTAT's proposed concessions.  But it was not close to enough

---

[38] Complaint (doc. no. 1) at ¶ 91.

[39] Id. at ¶ 94.

to preserve the viability of their arrangement from GTAT's perspective.

J.  Apple unveiling and GTAT's financial collapse

On September 9, 2014, Apple unveiled the iPhone 6.  During the iPhone 6 launch, Apple announced that the new phone would have a display produced from ion-strengthened glass, a product manufactured by GTAT's competitor.  Within two days of the announcement, GTAT's stock price fell more than 25% on heavy trading volume.

On October 6, 2014, GTAT filed for bankruptcy protection under Chapter 11 of the Bankruptcy Code, owing $1.3 billion to its creditors.  GTAT's bankruptcy announcement significantly diminished the value of the company.  On the day of the announcement, the price of GTAT stock fell from $11.06 per share to $0.80 per share on the heaviest trading volume in the history of the company.  The NASDAQ immediately suspended trading of the company's common stock, and GTAT was formally delisted shortly thereafter.

Apple withheld its final scheduled prepayment of $138 million because of GTAT's failure to perform.  Thus, GTAT received a total of $439 million from Apple in prepayments under the Agreement.  GTAT spent more than twice that amount --

approximately $900 million –- just to try to meet its
obligations under the Agreement.


**II.  <u>Analysis</u>**

As mentioned above, the plaintiff asserts four claims
against both defendants: Breach of the Fiduciary Duty of Care
(Count 1); Breach of the Fiduciary Duty of Loyalty (Count 2);
Corporate Waste (Count 3); and Equitable Subordination (Count
5).  He also asserts two claims against Gutierrez only: Breach
of Contract (Count 4); and "Objection to Claims" (Count 6), as
well as one claim against Squiller only: "Objection to Claims"
(Count 7).

The parties disagree over whether the claims are subject to
the heightened pleading standard of Federal Rule of Civil
Procedure 9(b) or the more lenient pleading standard of Rule
8(a).  The defendants argue that Rule 9(b) applies to all of the
plaintiff's claims, while the plaintiff contends that Rule 9(b)
does not apply to any of his claims.

As discussed <u>infra</u>, because portions of the plaintiff's
breach of fiduciary duty claims are grounded in fraud, those
portions of the claims are subject to Rule 9(b)'s heightened
pleading standard.  The factual allegations in the plaintiff's
complaint, however, easily clear that bar.

A.  Heightened pleading standard

Rule 9(b) provides that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  The defendants contend that although the complaint does not allege a claim for fraud per se, all of the plaintiff's claims are "grounded in . . . averments of fraud," and therefore are subject to Rule 9(b)'s rigorous pleading standards.  The plaintiff counters that his claims remain plausible absent allegations of fraud and are therefore not subject to Rule 9(b)'s heightened pleading requirements.

First, although the parties, and in particular the defendants, argue over whether Rule 9(b) applies to every claim asserted in the complaint, the rule plainly does not apply to Counts 3, 5, 6, or 7.  Although a claim for corporate waste, Count 3, may be based on allegations of fraud and therefore subject to Rule 9(b), see, e.g., Stern v. Gen. Elec. Co., 924 F.2d 472, 477 (2d Cir. 1991), that is not the basis of the corporate waste claim in this case.[40]  Rather, the plaintiff's corporate waste claim is based on allegations that in light of the defendants' knowledge about the infeasibility of the Apple venture, no person of ordinary, sound judgment could conclude

---

[40] GTAT was incorporated under Delaware law and the parties agree that Delaware law governs Counts 1 through 3 of the complaint.

that the venture was in GTAT's best interest.[41]  At most, such a

claim alleges that the defendants acted in bad faith, which does

not implicate Rule 9(b).  Stern, 924 F.2d at 477 (noting that in

the context of a corporate waste claim, "[u]nlike allegations of

fraud, . . . an allegation of bad faith would not need to be

supported by particular factual statements").  In addition, the

defendants' arguments as to why the plaintiff's equitable

subordination and set-off claims, Counts 5, 6, and 7, should be

dismissed are procedural, rather than substantive, in that they

argue that only the Reorganized Debtors, and not the plaintiff,

can bring such claims.  They also argue that even if the

plaintiff can bring such claims, he cannot do so in this

litigation.  Thus, the only claims to which Rule 9(b) may apply

are the breach of fiduciary duty claims asserted in Counts 1 and

2.

The plaintiff does not meaningfully dispute that at least a

portion of both of his breach of fiduciary duty claims is based

on allegations of fraud.  Both claims rest, in part, on

allegations that the defendants breached their fiduciary duty by

intentionally "[f]ailing to disclose material information to

---

[41] See Complaint (doc. no. 1) at ¶ 118 (alleging that the
defendants committed corporate waste because the Apple Agreement
"was so one-sided that no business person of ordinary, sound
judgment, particularly persons such as Defendants, who knew
about its technical and economic infeasibility, could conclude
that the contract was beneficial to the Company.").

[GTAT's] board of directors regarding the technical and economic feasibility of the Apple [Agreement]."[42]  Indeed, as the plaintiff specifically notes in his objection, this case is about the defendants' "misleading statements and failure to disclose material information to GTAT's board—in their capacities as corporate officers—when asking the board to approve the Apple [Agreement]."[43]  Thus, at least a portion of the plaintiff's breach of fiduciary duty claims is based on "core allegations [that] effectively charge fraud" and those portions of the claim therefore fall under the umbrella of Rule 9(b).  N. Am. Catholic Educ. Programming Found., Inc. v. Cardinale, 567 F.3d 8, 15 (1st Cir. 2009) (analyzing claims for breach of fiduciary duties of loyalty and care under Rule 9(b) because the claims were based on the defendants' alleged fraudulent omission of material facts); see Hallal v. Vicis Capital Master Fund Ltd., No. CIV.A. 12-10166-NMG, 2013 WL 1192384, at *15 (D. Mass. Feb. 25, 2013) (Boal, J.) (applying Rule 9(b) to plaintiff's breach of fiduciary duty claim because that claim was based on central allegations that the defendants were involved in an insurance fraud scheme).

---

[42] Complaint (doc. no. 1) at ¶¶ 108(f) (breach of fiduciary duty of care claim) & 114(f) (breach of fiduciary duty of loyalty claim).

[43] Pl.'s Obj. (doc no. 26) at 40 (emphasis in original).

Despite the defendants' insistence to the contrary, however, the plaintiff's breach of fiduciary duty claims are not based entirely on allegations of fraud. Indeed, the plaintiff's breach of fiduciary duty of care claim in Count 1 alleges that the defendants were obligated "to act in an informed, deliberate, and rational manner . . . and with the degree of care that an ordinary prudent person would exercise under the same or similar circumstances."[44] The plaintiff further alleges that the defendants "breached their fiduciary duty of care to [GTAT] by engaging in <u>grossly negligent</u> conduct . . . and by failing to act in an informed, deliberate and rational manner with respect to the Apple [Agreement]."[45] The plaintiff provides specific examples of such breaches, including that the defendants allegedly ignored other business opportunities, put GTAT into a weak bargaining position with Apple, and ignored material information regarding the infeasibility of the venture. The plaintiff's breach of fiduciary duty of loyalty claim alleges similar, and often identical, conduct by the defendants.[46] These allegations are not "grounded in fraud" and are therefore not subject to Rule 9(b)'s heightened pleading

---

[44] Complaint (doc. no. 1) at ¶ 107.

[45] <u>Id.</u> at ¶ 108 (emphasis added).

[46] <u>See</u> <u>id.</u> at ¶¶ 113-114.

requirement.  See, e.g., Enercon v. Glob. Computer Supplies, Inc., 675 F. Supp. 2d 188, 198 (D. Me. 2009) (Singal, J.) (holding that Rule 9(b) does not apply to all of the plaintiff's claims because certain "allegations adumbrate a set of circumstances plausibly free of fraud").

Thus, the court will address only the portions of the plaintiff's breach of fiduciary duty claims that are based on core allegations of fraud to determine whether the complaint meets the heightened pleading standard of Rule 9(b).

B.  Particularity under Rule 9(b)

The heightened standard imposed by Rule 9(b) to plead fraud with particularity "means that a complaint rooted in fraud must specify the who, what, where, and when of the allegedly false or fraudulent representations" or omissions.  Moore v. Mortg. Elec. Registration Sys., Inc., 848 F. Supp. 2d 107, 123 (D.N.H. 2012) (internal citation omitted).  In addition, "a complaint's general averment of the defendant's 'knowledge' of material falsity" is inadequate "unless the complaint also sets forth specific facts that make it reasonable to believe that defendant knew that a statement was materially false or misleading." Cardinale, 567 F.3d at 13 (quoting Greenstone v. Cambex Corp., 975 F.2d 22, 25 (1st Cir. 1992)) (emphasis in original); N.H. Elec. Coop., Inc. v. Elster Sols., LLC, No. 16-CV-440-PB, 2017

27

WL 2861667, at *3 (D.N.H. July 5, 2017) (Barbadoro, J.) ("A plaintiff may allege knowledge or scienter 'generally,' but must still allege facts that meet the plausibility standard of Rule 8(a).").

The plaintiff alleges that the defendants knew that GTAT would be unable to meet the demands of the Apple Agreement and deliberately withheld that information from and gave misleading information to GTAT's board, to convince it that GTAT could meet its contractual obligations. The defendants contend that this portion of the plaintiff's breach of fiduciary duty claims fails under Rule 9(b) because the complaint does not plead a material misrepresentation or omission, or scienter, with particularity.

Although the defendants purport to challenge the level of particularity with which the plaintiff has alleged fraud, in reality, the defendants argue that the plaintiff fails to allege sufficient facts to show a breach of fiduciary duties in light of the content of the board meeting minutes and their presentations to the board. That is, the defendants challenge the claims on the merits. For example, the defendants do not contend that the complaint fails to plead the who, what, where, and when of the allegedly false or fraudulent representations or omissions. Indeed, as discussed further infra, the complaint is replete with specific allegations of misrepresentations and omissions of material fact during the defendants' presentations

to the board regarding the Apple venture.  Nor do the defendants contend that the complaint lacks specific factual allegations that make it reasonable to believe that the defendants knew that they were misleading or withholding material information from the board.

Instead, the defendants charge that the plaintiff "has not pled his claims with particularity, where, as here, those allegations, <u>informed by the documents incorporated by reference, negate, rather than support, any inference of fraud</u>."[47]  As discussed further <u>infra</u>, the defendants quote extensively from board meeting minutes and their presentations to the board, pointing to various facts that may support a defense to the plaintiff's breach of fiduciary duty claims.  For purposes of Rule 9(b), however, the question is the sufficiency of the pleadings -- not the merits of the plaintiff's claims.  The defendants raise no actual challenge the level of particularity of plaintiff's allegations of fraud.

As recounted in detail in the background section, and as discussed further <u>infra</u>, the plaintiff provides ample allegations of 1) the defendants' misrepresentations or omissions of material fact to the board concerning the Apple venture and 2) the facts known to the defendants at the

---

[47] Defs.' Reply (doc. no. 29) at 9 (emphasis added).

pertinent time that support an inference that they acted with scienter.[48]  Although there may be facts that weigh in the defendants' favor, those facts do not undermine the particularity of the plaintiff's allegations for the purposes of Rule 9(b).[49]

C.  Sufficiency of the claims under Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), the plaintiff must state a claim for relief by pleading "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Martinez v. Petrenko, 792 F.3d 173, 179 (1st Cir. 2015) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).  In ruling on such

---

[48] At oral argument, the defendants repeatedly argued that the complaint lacked allegations to support a reasonable inference of scienter.  By way of example, and as discussed further infra, the complaint alleges that GTAT's employees continuously warned and expressed grave concerns to the defendants about the unrealistic and unattainable assumptions that the defendants included in their cost models.  The complaint further alleges that the defendants ignored those warnings and told the board that the Apple Agreement was in GTAT's best interest because the assumptions underlying the models were "conservative".  Such allegations, when viewed in the light most favorable to the plaintiff, are sufficient support a reasonable belief and inference that the defendants knew that they were misleading the board.

[49] Because the defendants fail to make a persuasive argument as to Rule 9(b), the court would deny their motion even if, as they contend, Rule 9(b) applied to every claim asserted in the complaint.

a motion, the court accepts as true all well-pleaded facts set
forth in the complaint and draws all reasonable inferences in
the plaintiff's favor.  See, e.g., Martino v. Forward Air, Inc.,
609 F.3d 1, 2 (1st Cir. 2010).  The court "may consider not only
the complaint but also facts extractable from documentation
annexed to or incorporated by reference in the complaint and
matters susceptible to judicial notice." Rederford v. U.S.
Airways, Inc., 589 F.3d 30, 35 (1st Cir. 2009) (internal
quotations omitted).

The defendants contend that the plaintiff's claims for
breach of the fiduciary duty of care, breach of the fiduciary
duty of loyalty, corporate waste, and equitable subordination,
as well as his objections to the defendants' claims in GTAT's
bankruptcy action, fail under Rule 12(b)(6).  For the reasons
stated infra, they are incorrect as to each claim.


1.  Breach of fiduciary duty of care (Count 1)

The fiduciary duty of care requires that directors of a
Delaware corporation both: (1) "use that amount of care which
ordinarily careful and prudent men would use in similar
circumstances"; and (2) "consider all material information
reasonably available." In re Walt Disney Co. Derivative Litig.,
907 A.2d 693, 749 (Del. Ch. 2005) (internal quotation marks and
citation omitted).  Delaware "law presumes that in making a

business decision the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the company." In re Walt Disney Co. Derivative Litig., 906 A.2d 27, 52 (Del. 2006) (internal quotation marks and citation omitted).  A plaintiff can rebut this presumption, referred to as the business judgment rule, if he shows that a director failed to inform himself "fully and in a deliberate manner." Cede & Co. v. Technicolor, Inc., 634 A.2d 345, 368 (Del. 1993).  The proper standard for determining whether a director or officer failed to properly inform himself is gross negligence. Smith v. Van Gorkom, 488 A.2d 858, 873 (Del. 1985); see also United Artists Theatre Co. v. Walton, 315 F.3d 217, 231 (3d Cir. 2003).  A plaintiff can also rebut this presumption by showing that a director or officer acted in bad faith. Disney, 906 A.2d at 52.  If the plaintiff successfully rebuts this presumption, "the burden then shifts to the director defendants to demonstrate that the challenged act or transaction was entirely fair to the corporation and its shareholders."[50] Id.

---

[50] The plaintiff argues that although the business judgment rule applies to a board of directors or individual directors themselves, it is "far from clear" that the rule applies to officers.  Although there are recent cases applying the rule to officers, see, e.g., City of Miami Gen. Emps. v. Comstock, No. CV 9980-CB, 2016 WL 4464156, at *22 (Del. Ch. Aug. 24, 2016), another court has noted that a "vibrant debate exists" as to whether the rule applies to officers.  Amalgamated Bank v.

a.   <u>Substantive due care</u>

Initially, the defendants assert that Count 1 should be dismissed because it is a "substantive due care" claim -- a claim that challenges the "wisdom of the decision to enter into the Apple Agreement" -- which is not recognized under Delaware law.  They cite the following language from <u>In re Caremark Int'l Inc. Deriv. Litig.,</u> 698 A.2d 959 (Del. Ch. 1996), the seminal case outlining directors' fiduciary duty of care:

> What should be understood, but may not widely be understood by courts or commentators who are not often required to face such questions, is that compliance with a director's duty of care can never appropriately be judicially determined by reference to <u>the content of the board decision</u> that leads to a corporate loss, apart from the good faith or rationality of the process employed.  That is, whether a judge or jury considering the matter after the fact, believes a decision substantively wrong, or degrees of wrong extending through "stupid" to "egregious" or "irrational", provides no ground for director liability, so long as the court determines that the process employed was either rational or employed in a <u>good faith</u> effort to advance corporate interests.  To employ a different rule—one that permitted an "objective" evaluation of the decision—would expose directors to substantive second guessing by ill-equipped judges or juries, which would, in the long-run, be injurious to investor interests.

<u>Id.</u> at 967 (emphasis in original).

---

<u>Yahoo! Inc.,</u> 132 A.3d 752, 781 n.24 (Del. Ch. 2016).  Because the business judgment rule does not entitle the defendants to dismissal at this stage of the litigation, the court assumes without deciding that the rule applies to officers of a corporation for purposes of this motion only.

In characterizing the plaintiff's breach of fiduciary duty
of care claim as a substantive due care claim, the defendants
appear to attempt to set up a straw man in order to knock it
down.  The plaintiff's claim is not, as the defendants contend,
based on allegations that the defendants breached their duty of
care by merely recommending a risky transaction to the board.
Rather, the claim is based on allegations that the defendants
were either grossly negligent or acted in bad faith in
recommending the Apple Agreement to the board.

Specifically, the plaintiff alleges that the defendants,
either deliberately or through gross negligence, (1) failed to
employ reasonable assumptions regarding the technical
feasibility of the deal in GTAT's cost models despite repeated
warnings from GTAT employees, (2) failed to relay material
information concerning the negotiations and feasibility of the
Apple venture to the board which may have influenced the board's
decision, and (3) failed to consider material information that
would have shown that GTAT simply could not satisfy its
obligations under the Apple Agreement.  These allegations do not
question the ultimate wisdom of the Apple venture.  Rather, they
challenge the defendants' good faith in recommending the
transaction to the board and question the rationality of the
process by which the defendants' reached that decision.
Therefore, the plaintiff's claims in Count 1 is not a

substantive due care claim, and the defendants are not entitled to the dismissal of Count 1 on that basis.

###     b.     Breach of the duty of care

The defendants next contend that even if Count 1 is not a substantive due care claim, the complaint does not plausibly allege that they breached their fiduciary duty of care.  They point to their presentations to the board regarding potential risks of the Apple venture which, they contend, show that they disclosed accurate information concerning the technical and economic risks of the deal.  The defendants also note that, rather than hiding any supposed concerns that had been expressed by the GTAT team, the defendants specifically allowed Richardson and Mark Bentham[51] to make presentations to the board regarding the Apple venture.[52]  In addition, the defendants cite the October 28, 2013 board meeting minutes which show that the board

---

[51] Defendants state that Bentham was GTAT's Vice President, Worldwide Operations.

[52] The defendants include with their motion to dismiss the minutes of the various board meetings discussing the proposed Apple venture, as well as presentations that Gutierrez and/or Squiller made to the board.  See doc. nos. 22-3 – 22-14.  The plaintiff quotes from several of these documents in his complaint, and does not meaningfully dispute that the court may consider the minutes at this stage of the litigation, as the content of the defendants' representations to the board are central to the plaintiff's claims.

retained and met with two well-respected law firms regarding the potential deal prior to the board's approval of the Agreement.[53] Finally, they make much of the fact that the board itself never took action against the defendants, and retained both defendants as senior officers, even after GTAT declared bankruptcy. The defendants contend that these circumstances unequivocally show that they acted in good faith and that both they and the board were diligent and fully informed of the risk of the venture.

The defendants point to various facts that may support a defense to the plaintiff's breach of fiduciary duty of care claim. At this stage of the litigation, however, those facts simply cannot negate the allegations in the complaint that support the opposite inference. See In re Dial Complete Mktg. & Sales Practices Litig., No. 11-MD-2263-SM, 2013 WL 1222310, at *4 (D.N.H. Mar. 26, 2013) (acknowledging that the defendant's proffered facts that undermine the plaintiffs' allegations "may, of course, be true," but noting that at the motion to dismiss "stage of the litigation, plaintiffs need not disprove that claim").

For example, the complaint alleges that the defendants misled the board concerning the negotiations that led up to the

---

[53] See October 28, 2013 Bd. Meet. Min. (doc. no. 22-12) at 3.

Apple Agreement. Gutierrez told the board that GTAT had made progress with and earned significant concessions from Apple in their negotiations of the Agreement, and that he and Squiller deemed the transaction to be in GTAT's best interest. In contrast, however, Gutierrez allegedly was unable to procure any concessions from Apple, thought the deal "sucked," and did not believe that GTAT had any chance of fulfilling its obligations under the Agreement. In addition, in his presentation to the board on October 28, 2013, the date the board voted to approve the Apple Agreement, Gutierrez reaffirmed an earlier representation to the board that Apple treated GTAT "as a valued 'partner.'"[54] Squiller stated in his declaration in GTAT's bankruptcy action, however, that because "GTAT had no practical choice at that stage other than to concede to Apple's terms, Apple forced a set of agreements on GTAT that, in combination with Apple's economic leverage, put Apple in de facto control of GTAT."[55] Although the defendants contend that mischaracterizing negotiations leading up to an agreement is not a violation of their fiduciary duty because it would not have changed the

---

[54] October 28, 2013 Bd. Pres. (doc. no. 22-14) at 3.

[55] Squiller Decl. (doc. no. 22-1) at 7-8, ¶ 15.

board's decision,[56] they cite no case law in support of that proposition.

The complaint also alleges that the defendants misled the board concerning the technological infeasibility of the Apple venture.  For example, the complaint notes that the defendants told the board that complying with the terms of the Apple Agreement -- such as producing a 262 kg sapphire boule consistent with Apple's accelerated timeline -- was "plausible" and a "reasonable proposition" because they had negotiated "[v]ery conservative start-up yields" and their models were "conservative compared to actual projections."[57]  According to the complaint, the defendants made these representations despite being warned repeatedly by GTAT employees that the assumptions underlying the cost models were completely unrealistic and unattainable, and that GTAT would be unable to meet Apple's production requirements.  When faced with these warnings, allegedly because they were acting in bad faith or because they were grossly negligent, the defendants' response, alleged in the complaint, was continually to ignore them entirely or to push the underlying assumptions to an even more aggressive point despite having no basis to do so.  Moreover, the defendants

---

[56] See Defs.' Reply (doc. no. 29) at 22.

[57] Complaint (doc. no. 1) at ¶ 77.

never disclosed to the board their models, or the allegedly unrealistic assumptions underlying those models, which supposedly supported GTAT's ability to profit under the Apple Agreement.

In addition, although Richardson and Bentham made presentations to the board during the October 28, 2013 meeting, the defendants have not shown that they disclosed GTAT's internal team's concerns. Indeed, the board meeting minutes do not show that Richardson or Bentham informed the board of the concerns the GTAT team had expressed to Gutierrez and/or Squiller over the previous few weeks.[58] Richardson "presented a technical overview of the 262kg program, including product upgrade objectives, reducing the cost per kg, intellectual property implications, the development schedule, alternative strategies for providing material in the event of delay in process development and process prepayment milestones."[59] Bentham "presented details of the facility and operations plan, including details on the factory, equipment and facility supply,

_____

[58] It is worth noting that although the complaint lists several members of GTAT's research team who expressed concerns regarding GTAT's internal models, Bentham is not one of them. The complaint contains only one reference to Bentham, and it is that Matthews recalled the utilization rates being a point of contention with Bentham. See Complaint (doc. no. 1) at ¶ 64.

[59] October 28, 2013 Bd. Meet. Min. (doc. no. 22-12) at 2.

a breakdown of the product cost per kg and the brick delivery and yield ramp."[60]   After those presentations, Gutierrez himself discussed "management's risk mitigation strategy."[61]   Thus, it is unclear whether Richardson or Bentham disclosed any concerns regarding feasibility of the venture to the board.[62]

Despite the plaintiff's allegations, the defendants invoke the business judgment rule, painting the complaint as showing only "[g]ood faith mistakes in estimation."   They analogize the circumstances of this case to those of Trenwick Am. Litig. Tr. v. Ernst & Young, L.L.P., 906 A.2d 168 (Del. Ch. 2006), aff'd sub nom. Trenwick Am. Litig. Tr. v. Billett, 931 A.2d 438 (Del. 2007).   In that case, which the defendants contend is "on all fours," a litigation trust brought an action against former directors of a holding company alleging several claims, including breach of the fiduciary duty of care, based on an ill-advised transaction that led to the company's bankruptcy.   The court granted the defendants' motion to dismiss the plaintiff's breach of fiduciary duty of care claim, holding that the

---

[60] Id.

[61] Id.

[62] Although the defendants note that the board retained legal counsel who attended the October 28, 2013 board meeting, they do not explain why that fact is relevant to the viability of the plaintiff's breach of fiduciary duty claims.   The defendants also do not show that the board's failure to fire them undermines those claims.

business judgment rule provided the defendants with protection from the claim.  The defendants point to the court's statement in granting the motion to dismiss that the plaintiff had not alleged "that [defendants] undertook a major acquisition without conducting due diligence, without retaining experienced advisors, and after holding a single meeting at which management made a cursory presentation."  Id. at 194.

Although the Chancery Court in Trenwick listed those actions "by way of example," id., that is hardly an exhaustive list of conduct that could overcome the business judgment rule. Regardless, the facts alleged by the plaintiff in this case are a far cry from those in Trenwick that the court deemed insufficient to overcome the business judgment rule.  In Trenwick, the plaintiff alleged "that a majority independent board undertook a business strategy that was 'all consuming and foolhardy' and that turned out badly," and asked that "the court infer that the later failure resulted from a grossly deficient level of effort or from disloyal motives."  Id.  Here, in contrast, the plaintiff alleges that the defendants were warned repeatedly by GTAT's internal team that the cost models they were using were unrealistic and that GTAT could not feasibly comply with the terms of the Apple Agreement.  Despite these warnings, the defendants, allegedly acting intentionally or in a grossly negligent manner, withheld this information from the

41

board, and instead painted a distorted picture of the feasibility of the venture to get the board to approve the deal.

In other words, the complaint does not ask the court to infer that the failure of the Apple venture was because of gross negligence or bad faith. Instead, when viewed in the light most favorable to the plaintiff, the complaint specifically alleges facts to show gross negligence or bad faith. Those facts are enough to "give rise to a reason to doubt business judgment protection," and are sufficient to survive a motion to dismiss. In re Walt Disney Co. Derivative Litig., 825 A.2d 275, 289 (Del. Ch. 2003) (denying motion to dismiss breach of fiduciary duty claims based on the business judgment rule because "all of the alleged facts, if true, imply that the defendant directors knew that they were making material decisions without adequate information and without adequate deliberation, and that they simply did not care if the decisions caused the corporation and its stockholders to suffer injury or loss" (emphasis in original)); In re Enivid. Inc., 345 B.R. 426, 447 (Bankr. D. Mass. 2006) (denying motion to dismiss breach of fiduciary duty of care claim under Delaware law and holding that the business judgment rule did not apply where the defendant director, among

other things, "ignor[ed] information and advice provided by [the company's] other officers" regarding a proposed transaction).[63]

The court denies the defendants' motion to dismiss as it pertains to Count 1.


2.    Breach of fiduciary duty of loyalty (Count 2)

"[T]he duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally." Cede & Co., 634 A.2d at 361; Guth v. Loft, Inc., 5 A.2d 503, 510 (Del. 1939).  The duty of loyalty includes a requirement to act in good faith, which is "a subsidiary element, i.e., a condition, of the fundamental duty of loyalty." Stone ex rel. AmSouth Bancorporation v. Ritter, 911 A.2d 362, 370 (Del. 2006) (internal quotation marks and citation omitted).  "'A failure to act in good faith may be shown, for instance, where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation.'" Frederick

---

[63] To the extent the defendants believe that the business judgment rule protects them from liability, that defense is "dependent on facts more appropriately presented under Rule 56 (motion for summary judgment) or Rule 50 (motion for judgment as a matter of law)." Proffe Publ'g, Inc. v. Lindner, No. 16-CV-93-JL, 2016 WL 6892466, at *6 (D.N.H. Nov. 22, 2016) (denying motion to dismiss breach of fiduciary duty claim based on the business judgment rule).

[Hsu Living Tr. v. ODN Holding Corp.](#), No. CV 12108-VCL, 2017 WL 1437308, at *16 (Del. Ch. Apr. 14, 2017) as corrected (Apr. 24, 2017) (quoting [Disney](#), 906 A.2d at 67); see also [Schoon v. Smith](#), 953 A.2d 196, 206 (Del. 2008).

The defendants argue that the plaintiff's claim for breach of the fiduciary duty of loyalty fails for several reasons. They assert that the plaintiff's claim is based on allegations that the defendants 1) had a conflict of interest or acted in bad faith, 2) breached the duty of candor, and 3) engaged in insider trading. The defendants contend that the complaint fails to allege facts that plausibly support any of these theories. They are incorrect in all respects.

a.   Conflict of interest or bad faith

The defendants contend that the complaint fails to plausibly allege that they had a conflict of interest or acted in bad faith because, in light of their ownership of a significant number of GTAT shares, their interests in the Apple Agreement were perfectly aligned with those of GTAT's other shareholders. In other words, the defendants contend that there is no plausible reason that they would have intentionally driven GTAT toward a transaction that was guaranteed to fail because they would have been harmed just like any other shareholder.

The complaint alleges that GTAT was a struggling company and that its struggles negatively impacted the defendants' compensation.  The defendants embarked on a strategy to focus their business entirely on sapphire, despite having little experience in that area, and pursued what could generously be called a risky contractual arrangement with Apple.  When Apple renegotiated the terms of that arrangement, the proposed venture went from risky to at best foolhardy and at worst doomed to failure.  Armed with that knowledge, the defendants allegedly deliberately, or in a grossly negligent manner, withheld critical information from the board of directors which would have shown that the deal was not technologically feasible and that it was not in GTAT's best interest, knowing that approval of the deal would mean an immediate rise in the value of GTAT stock and large bonuses for both of them.  Once that came to fruition, both defendants sold significant portions of their stock to cash in on their alleged deceit, knowing that the jig would soon be up once GTAT failed to comply with the terms of the Apple Agreement, which the defendants knew it would.

The defendants contend that this story is a fairy tale, created by the plaintiff in an effort to find someone to blame for what was simply a risky deal that was approved by a fully-informed board of directors.  While the defendants may eventually prove their version of events (or prevent the

plaintiff from proving his), at this stage of the litigation, the plaintiff's complaint, taken as true with all reasonable inferences, is more than sufficient to allege that the defendants acted with a purpose other than advancing GTAT's best interests. See Palmer v. Reali, 211 F. Supp. 3d 655, 667 (D. Del. 2016) (denying motion to dismiss breach of loyalty claim where the "facts as pled plausibly demonstrate that defendants placed their own interest in receiving compensation over the best interest of the Company and its shareholders"); Enivid., 345 B.R. at 445 (holding that plaintiff had adequately pled that the defendant director breached his fiduciary duty of loyalty where the complaint alleged that the defendant was motivated by his stock position and perquisites "coupled with his unwavering personal adherence to the acquisition strategy in the face of mounting operational and financial problems and warnings").[64]

The complaint more than sufficiently alleges that the defendants had a motive to, and did act against GTAT's economic

---

[64] The defendants contend that because their interests were aligned with GTAT's stockholders generally, they cannot have had a conflict of interest. Although a "director who is also a shareholder of his corporation is more likely to have interests that are aligned with the other shareholders of that corporation," Orman v. Cullman, 794 A.2d 5, 27 n.56 (Del. Ch. 2002), that fact hardly entitles the defendants to dismissal at this stage of the litigation, particularly in light of their sales of significant portions of their GTAT holdings shortly after the board approved the Apple Agreement.

interest.  And, as discussed supra, the complaint, viewed in the

light most favorable to the plaintiff, alleges that the

defendants acted in bad faith.  Thus, the defendants' arguments

on this point are misplaced.

### b.    Candor

The defendants' remaining arguments are similarly without

merit.  The defendants' contention that the complaint fails to

allege that they breached the duty of candor because they

disclosed all material information regarding the Apple venture

to the board does not require serious attention.[65]  The duty of

candor "represents nothing more than the well-recognized

proposition that directors of Delaware corporations are under a

fiduciary duty to disclose fully and fairly all material

information within the board's control when it seeks shareholder

action."  Stroud v. Grace, 606 A.2d 75, 84 (Del. 1992).  As

discussed supra, the complaint adequately alleges that the

defendants knew of material information that showed that the

---

[65] The "duty of candor" is not an altogether separate duty,
but "derives from the duties of care and loyalty."  Pfeffer v.
Redstone, 965 A.2d 676, 684 (Del. 2009); see OptimisCorp v.
Waite, No. CV 8773-VCP, 2015 WL 5147038, at *72 n. 578 (Del. Ch.
Aug. 26, 2015) (noting that the duty of candor "can implicate
either the duty of care or the duty of loyalty"), aff'd, 137
A.3d 970 (Del. 2016).  Because the defendants raise the issue of
the duty of candor with respect to the plaintiff's allegations
in Count 2, the court addresses those arguments here.

models GTAT used to show that GTAT could feasibly comply with the terms of the Apple Agreement were based on fictitious and unattainable assumptions, and that the defendants withheld that information from the board.  Thus, the complaint adequately alleges that the defendants breached the duty of candor.

### c.  Misuse of confidential information

Finally, the complaint sufficiently alleges a breach of the fiduciary duty of loyalty based on the defendants' sale of significant portions of their GTAT stock shortly after the Apple Agreement was publicly announced when the stock price soared. As the parties agree, a claim for breach of the fiduciary duty of loyalty based on the misuse of confidential corporate information is derived from the standards set forth in Brophy v. Cities Serv. Co., 31 Del. Ch. 241 (Del. 1949), and, therefore, is often referred to as a "Brophy claim."  To state a Brophy claim, a plaintiff must allege that "'1) the corporate fiduciary possessed material, nonpublic company information; and 2) the corporate fiduciary used that information improperly by making trades because []he was motivated, in whole or in part, by the substance of that information.'"  Kahn v. Kolberg Kravis Roberts & Co., L.P., 23 A.3d 831, 838 (Del. 2011) (quoting In re Oracle Corp., 867 A.2d 904, 934 (Del. Ch. 2004), aff'd, 872 A.2d 960 (Del. 2005)).  "Delaware case law makes the same policy judgment

as federal law does, which is that insider trading claims depend importantly on proof that the selling defendants acted with scienter." Guttman v. Huang, 823 A.2d 492, 505 (Del. Ch. 2002)

The defendants argue that the plaintiff fails to allege a Brophy claim based on three deficiencies.  First, the defendants contend that the claim fails because the complaint alleges that most of the trades were made pursuant to a written trading plan, allowable under Rule 10b5-1.[66]  Second, they contend that the complaint must, but does not, allege that the sales were made on the basis of "hard" information.  And third, they contend that the complaint fails to allege that each individual sale referenced in the complaint was made on the basis of adverse material, non-public information.  None of these arguments has merit.

The defendants cite several cases that purportedly hold that a plaintiff may not rely on a defendant's sale of stock pursuant to a Rule 10b5-1 plan to support an inference of scienter at the motion to dismiss stage.  It is true that, as a general matter, such automatic transactions are not indicative of scienter.  See, e.g., In re Level 3 Commc'ns Inc. Sec.

---

[66] Although not specified by the defendants, their first argument appears to pertain to Gutierrez only.  The complaint does not allege that Squiller sold his GTAT shares pursuant to a Rule 10b5-1 plan.

Litig., 667 F.3d 1331, 1346-47 (10th Cir. 2012) (noting that sales made pursuant to automatic transactions can rebut an inference of scienter).  What the defendants ignore, of course, is that the complaint alleges that Gutierrez entered the Rule 10b5-1 trading plans <u>after</u> the announcement of the Apple deal.[67] The timing is "sufficient at this stage of the litigation to prevent the trading plans from entirely undercutting the inference of scienter." Levy v. Gutierrez, No. 14-cv-443-JL, 2017 WL 2191592, at *14 (D.N.H. May 4, 2017) (citing In re Biogen Idec, Inc. Sec. Litig., Civ. No. 05-10400-WGY, 2007 WL 9602250, at *14 (D. Mass. Oct. 25, 2007) & Freudenberg v. E*Trade Fin. Grp., 712 F. Supp. 2d, 171, 201 (S.D.N.Y. 2010)).

The defendants also claim that the plaintiff's <u>Brophy</u> claim must be dismissed because it not based on "hard" information such as "objective, historical and factual data."[68]  They argue that instead, the plaintiff's <u>Brophy</u> claim is based on information such as projections and opinions concerning the viability of the Apple transaction, and that such "soft" information does not support such a claim.

It is true that "[g]enerally, 'soft' information, such as projections and estimates as to value, need not be disclosed due

_____

[67] Complaint (doc. no. 1) at ¶ 83.

[68] Defs.' Mem. (doc. no. 22-1) at 50.

to their lack of reliability." Repairman's Serv. Corp. v. Nat'l
Intergroup, Inc., No. 7811, 1985 WL 11540, at *8 (Del. Ch. Mar.
15, 1985); see also In re Facebook, Inc., IPO Sec. & Derivative
Litig., 922 F. Supp. 2d 445, 469 (S.D.N.Y. 2013) (noting that
Delaware courts are reluctant to find valid <u>Brophy</u> claims based
on "soft" information such as trends or projections of
performance), aff'd sub nom. In re Facebook, Inc., Initial Pub.
Offering Derivative Litig., 797 F.3d 148 (2d Cir. 2015).  But
under "Delaware law, the fact that information is 'soft' (e.g.,
a prediction of future results) rather than 'hard' (e.g.,
historical fact) is relevant to, but not entirely dispositive
of" whether a plaintiff has stated a valid <u>Brophy</u> claim.  In re
Oracle Corp., 867 A.2d at 934.  Regardless, however, the
plaintiff's <u>Brophy</u> claim is based on more than mere projections
or trends.  Giving the allegations in the complaint every
reasonable inference, the defendants knew, based on their
deliberate manipulation of the cost models, that GTAT would be
unable to comply with the requirements of the Apple Agreement
shortly after the deal was consummated.  The defendants fail to
explain how such information could appropriately be
characterized as "soft".

Finally, the defendants argue that the complaint fails to
state a <u>Brophy</u> claim because it does not allege that "each sale
by each individual defendant was entered into and completed on

the basis of, and because of, adverse material non-public information."[69]  Here, again, the defendants attempt to misapply a generalized statement of the law.  The complaint alleges Gutierrez sold over 600,000 shares and Squiller sold 121,190 in the months following the board's approval of the Apple Agreement with knowledge that GTAT would soon thereafter fail to comply with the material terms of the Agreement and that GTAT's stock would tumble in value.  Under the defendants' view of the law, the plaintiff's allegations are insufficient because the complaint fails to separate and specifically discuss each particular sale that the defendants made.  Unsurprisingly, the defendants fail to cite any case that puts such a high burden on a plaintiff at the pleading stage, and the court is aware of none.

For those reasons, the court denies the defendants' motion to dismiss Count 2 of the complaint.


2.  Corporate waste (Count 3)

"To recover on a claim of corporate waste, the plaintiffs must shoulder the burden of proving that the exchange was 'so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate

---

[69] Defs.' Mem. (doc. no. 22-1) at 48 (quoting Guttman, 823 A.2d at 505) (emphasis omitted).

consideration.'" Disney, 906 A.2d at 74 (quoting Brehm v. Eisner, 746 A.2d 244, 263 (Del. 2000)). "A claim of waste will arise only in the rare, 'unconscionable case where directors irrationally squander or give away corporate assets.'" Id. (quoting Brehm, 746 A.2d at 263). "This onerous standard for waste is a corollary of the proposition that where business judgment presumptions are applicable, the [directors'] decision will be upheld unless it cannot be 'attributed to any rational business purpose.'" Id. (quoting Sinclair Oil Corp. v. Levien, 280 A.2d 717, 720 (Del. 1971)).

The defendants argue in cursory fashion that because Apple paid GTAT nearly $500 million during the course of the Agreement, the transaction cannot possibly be deemed a waste. But they ignore the crux of the complaint: that the defendants acted in bad faith, and that their recommendation to the board to enter into the Apple Agreement was not "based on a valid assessment of the corporation's best interests." White v. Panic, 783 A.2d 543, 554 n.36 (Del. 2001) (noting how allegations of bad faith can support a claim for corporate waste); see also Palmer, 211 F. Supp. 3d at 669 (noting that a plaintiff can plead a claim for corporate waste when the decision to enter into a transaction goes "so far beyond the bounds of reasonable business judgment that its only explanation

is bad faith." (quoting Stanziale v. Nachtomi, 416 F.3d 229, 238 (3d Cir. 2005) (internal quotation marks omitted)).

That is precisely what the complaint alleges here: that the defendants pursued a transaction and ultimately recommended it to GTAT's board of directors while knowing that it would ultimately doom the company. That GTAT received $478 million in "prepayments" from Apple, which Squiller later described as a mere "loan" on which GTAT secured repayment by taking liens on GTAT assets, does not operate to protect the defendants from a claim of corporate waste in light of the plaintiff's allegations of bad faith.

Accordingly, the court denies the defendants' motion as it pertains to Count 3.

3.   Equitable subordination and set-off objections (Counts 5-7)

In Counts 5, 6, and 7, the plaintiff sets forth objections relating to claims scheduled in GTAT's bankruptcy case on the defendants' behalf. The defendants contend that the court should dismiss these three counts for two reasons. The first is that under GTAT's plan of reorganization, it is the Reorganized Debtors' right, not the plaintiff's, to litigate any "objections to claims." The second is that even if the plaintiff did have the right to file or litigate objections to claims, those claims

should be addressed in GTAT's bankruptcy action. According to the defendants, the claims become relevant in this case only if the plaintiff recovers a judgment and the defendants seek to assert the claims defensively.

The defendants have not shown that they are entitled to dismissal of Counts 5, 6, and 7. They cite GTAT's plan of reorganization in its case in the Bankruptcy Court for the District of New Hampshire. See In re: GT Advanced Technologies Inc., et al., No. 14-11916-HJB (Bankr. D.N.H. Oct. 6, 2014). Specifically, they point to § 10.1 of the Plan, which provides: "Except as otherwise specifically provided in the Plan, after the Effective Date, the Reorganized Debtors shall have the sole authority (a) to file, withdraw, or litigate to judgment objections to Claims . . . ."[70] The defendants contend that Counts 5, 6, and 7 are all considered objections to claims and, therefore, the Reorganized Debtors, and not the plaintiff, have the sole authority to litigate such claims.

In response, the plaintiff cites § 8.16(e) of the Plan, which gives the Trustee the exclusive authority to pursue "Non-Released D&O Causes of Action."[71] Under the Plan, "'Non-Released

---

[70] Doc. no. 26-3 at 220.

[71] Id. at 209.

D&O Causes of Action' means any potential claims or Causes of Action" against former directors or officers,[72] including "any and all claims, actions, causes of action, . . . offsets, [and] counterclaims . . . of any kind or character whatsoever" belonging to GTAT or its bankruptcy estate, "including Avoidance Actions."[73] The Plan defines Avoidance Actions to include claims for subordination and actions under 11 U.S.C. § 510, which includes the claims asserted in Counts 5, 6, and 7.[74]

The defendants have not shown that under the Plan language, only the Reorganized Debtors can bring the claims asserted by the plaintiff here. Nor have the defendants adequately explained why, as a matter of law, the plaintiff would have to pursue his claims in bankruptcy court even if he were authorized to bring such claims. Therefore, the defendants' motion to dismiss is denied as to Counts 5, 6, and 7.

---

[72] Id. at 179.

[73] Id. at 167.

[74] Id. at 165.

IV.  **CONCLUSION**

For the reasons set forth herein, the defendants' motion to dismiss[19] is DENIED.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated:  March 27, 2018

cc:  Demetrio F. Aspiras, III, Esq.
     Brian J.S. Cullen, Esq.
     Jeremy R. Fischer, Esq.
     Jason D. Frank, Esq.
     Elizabeth G. Hays, Esq.
     Jordan D. Hershman, Esq.
     Eric D. Madden, Esq.
     Nathaniel J. Palmer, Esq.
     William T. Reid, IV, Esq.
     Emily E. Renshaw, Esq.

---

[19] Doc. no. 22.